IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ERIC A. CLAMPIT, | ) | CASE NO. 3:20-cv-01014 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Eric A. Clampit (Plaintiff" or "Clampit") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has

been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons

set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's

decision.

## I.  Procedural History

Clampit protectively filed applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on July 6, 2017.[1]  Tr. 28, 112, 113, 238-244, 246-252.

Clampit alleged disability beginning on June 30, 2017, (Tr. 28, 238, 246), due to learning

disability and explosive anger (Tr. 85, 115, 150, 166, 272).  After initial denial by the state

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. We may use this date to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 5/17/2021).

agency (Tr. 150-163) and denial upon reconsideration (Tr. 166-177), Clampit requested a

hearing (Tr. 178-179).  On November 26, 2018, a hearing was held before an Administrative

Law Judge ("ALJ").  Tr. 50-79.

On January 29, 2019, the ALJ issued a decision unfavorable to Clampit (Tr. 25-48),

finding that he had not been under a disability within the meaning of the Social Security Act

from June 30, 2017, through the date of the decision (Tr. 29, 43).  Clampit requested review of

the ALJ's decision by the Appeals Council.  Tr. 236-237.  On March 10, 2020, the Appeals

Council denied Clampit's request for review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-6.

## II. Evidence

### A. Personal, educational, and vocational evidence

Clampit was born in 1987.  Tr. 41, 114, 238.  He was 29 years old on the alleged

disability onset date and 31 years old at the time of the hearing.  Tr. 41, 53-54.   At the time of

the hearing, Clampit was living with his wife, his three minor children (ages 12, 8 and 3), and a

roommate.  Tr. 53.  Clampit has a GED.  Tr. 54, 61.  Clampit's past work included construction

worker, forklift operator, and palletizer or laborer, with many jobs being secured through

temporary employment agencies.  Tr. 54-56, 69-70.

### B. Medical evidence

Clampit received mental health treatment at Coleman Professional Services ("Coleman")

from 2013 through at least 2018.  Tr. 631-727, 728-745, 814-832.  Mental health treatment

records reflect that Clampit had problems with depression, controlling his anger, anxiety, audio

and visual hallucination, and paranoia.  *See e.g.*, Tr. 663, 704, 710, 816, 819, 820.

2

On August 23, 2017, clinical psychologist Michael J. Wuebker, Ph.D., conducted a consultative psychological evaluation.  Tr. 454-462.  When recounting his work history, Clampit relayed that his "bosses liked his work, but couldn't deal with his anger."  Tr. 456.  Clampit indicated he had walked off jobs and he had also been fired from jobs in the past.  Tr. 456. Clampit reported having dealt with depression throughout most of his life.  Tr. 456.  He also reported isolating himself, problems with falling asleep, and problems with anxiety and paranoia. Tr. 457-458.  Clampit denied hallucinations.  Tr. 457.  When Clampit was in grade school, he had been psychiatrically hospitalized for hitting his head against the wall.  Tr. 456. Approximately four years before his evaluation with Dr. Wuebker, Clampit had participated in court-ordered mental health counseling for anger problems.  Tr. 456.  Clampit was not taking psychotropic medications at the time of Dr. Wuebker's evaluation.  Tr. 456-457.  Clampit relayed that he had last taken psychotropic medications about two years earlier, stating "My psychiatrist retired and I didn't want to meet a new one."  Tr. 457.  Clampit described his activities of daily living, indicating that he played games on his phone, spent time on the internet looking at social media, interacted with his dogs and cats, helped his children with their math homework, visited with his in-laws a few times each week but he did not trust them, and he shopped in stores but did so quickly.  Tr. 459.

Dr. Wuebker opined that Clampit appeared to be functioning in the low range of cognition and he did not appear to exaggerate or minimize his symptoms. Tr. 459.  Dr. Wuebker diagnosed Other Specified Depressive Disorder - recurrent brief depression; Other Specified Anxiety Disorder - limited-symptoms attacks; and Paranoid Personality Disorder. Tr. 459.   With respect to Clampit's ability to understand, remember and carry out instructions, Dr. Wuebker stated that Clampit "would be expected to understand and apply instructions for one step and a

few complex workplace instructions." Tr. 460. With respect to Clampit's ability to maintain attention and concentration and maintain persistence and pace to perform simple and multi-step tasks, Dr. Wuebker indicated that Clampit "maintained the flow of conversation" during the interview; "[h]is attention was sufficient for questions to be answered[]"; and, Clampit relayed "that he had some problems with these abilities at work but would complete his tasks." Tr. 460. With respect to Clampit's ability to respond appropriately to supervision and to coworkers in a work setting, Dr. Wuebker stated that "It would appear likely that he . . . would have trouble relating to others appropriately in work situations." Tr. 460. With respect to Clampit's abilities in responding appropriately to work pressures in a work setting, Dr. Wuebker indicated that, "[d]ue to his mental health issues the claimant would likely have difficulty responding appropriately to work setting stressors[,]" noting that "[t]ypical responses have been to walk off jobs or to become verbally inappropriate and lose jobs." Tr. 460.

On August 29, 2017, on initial review, state agency psychological medical consultant Juliette Savitscus, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 89-90) and a Mental RFC Assessment (Tr. 92-94). Clampit's mental impairments included depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; and personality and impulse-control disorders. Tr. 89. In the PRT, Dr. Savitscus opined that Clampit was moderately limited in his ability to understand, remember or apply for information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. Tr. 90.

In the Mental RFC Assessment, Dr. Savitscus opined that Clampit was "capable of simple and moderately complex tasks 1 – 4 steps tasks[]"; however, because Clampit's "psychological [symptoms] may occasionally limit productivity in the workplace . . . [the] workplace should not have high production pace or production requirements." Tr. 93-94. Also,

Dr. Savitscus opined that Clampit "retain[ed] [the] ability for work in a setting with [occasional], superficial contact with others[]"; and Clampit "would be capable [of] responding appropriately to infrequent changes[.]" Tr. 94.

On September 22, 2017, upon reconsideration, state agency psychological medical consultant Kristen Haskins, Psy.D., completed a PRT (Tr. 120-121) and Mental RFC Assessment (Tr. 123-126). Clampit's mental impairments included depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; personality and impulse-control disorders; and learning disorder. Tr. 120. In the PRT, Dr. Haskins found that Clampit was moderately limited in his ability to understand, remember or apply for information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. Tr. 121. In the Mental RFC, Dr. Haskins reached similar conclusions as Dr. Savitscus in the areas of understanding and memory and social interactions. Tr. 124-125. However, Dr. Haskins' Mental RFC differed slightly from Dr. Savitscus' Mental RFC in the areas of sustained concentration and persistence and adaptation. Tr. 124-125. In the area of sustained concentration and persistence, Dr. Haskins indicated Clampit could perform "simple and moderately complex tasks[.]" Tr 124. However, she added that Clampit could "complete short cycle tasks in a setting that does not have fast paced demand where can work away from others[.]" Tr. 124. In the area of adaptation, Dr. Haskins opined that Clampit could "work within a set routine where major changes are explained in advance and gradually implemented to allow the claimant time to adjust to the new expectations[]" and "[t]he claimant's ability to handle stress and pressure in the work place would be reduced, but adequate to handle tasks without strict time limitations or production standards." Tr. 125.

Clampit was admitted to the emergency room at Mercy Health on March 27, 2018, after having threatened suicide. Tr. 562. Clampit reported that he made the threats to get attention

5

from his wife who was divorcing him.  Tr. 562.  Clampit relayed that he had mood swings and long-term anger issues.  Tr. 562.  On admission, Clampit's condition was "poor" and his diagnosis was major depressive disorder with single episode.  Tr. 562.  While admitted, Clampit's medications were adjusted and, after a few days, he started to improve.  Tr. 562.  He was discharged on April 2, 2018.  Tr. 562.  On discharge, Clampit's condition was "stable" and his diagnosis was intermittent explosive disorder; rule out bipolar disorder.  Tr. 562.

Following his inpatient hospitalization, Clampit continued with outpatient mental health treatment and medications.  Tr. 715.  During an intake session at Coleman on April 9, 2018, Clampit relayed that it had been a difficult situation with his wife but his children were keeping him going.  Tr. 715.  He denied suicidal/homicidal ideation and denied hallucinations.  Tr. 715.

During a counseling session on May 10, 2018, Clampit was well groomed and cooperative.  Tr. 732.  His mood was noted as "tired."  Tr. 732.  His affect was congruent.  Tr. 732.  He reported no hallucinations and no suicidal/homicidal ideation.  Tr. 732, 733.  His thought process was logical.  Tr. 733.  No impairment in Clampit's attention/concentration was noted.  Tr. 733.  Clampit relayed that he was continuing to have a hard time controlling his anger.  Tr. 733.  Clampit tried to separate himself from others but he relayed that he had poor coping skills.  Tr. 734.

When he attended counseling on May 24, 2018, Clampit's mood was "okay."  Tr. 736.  Otherwise, mental status examination findings were similar to those noted during his May 10, 2018, session.  Tr. 736-737.  Clampit and his wife were planning to talk that week to determine whether they would try to work on things between them.  Tr. 737.

During a June 7, 2018, counseling session, Clampit reported that "the edge [was] back" because he had not been able to find his medication for two days.  Tr. 740.  He also reported that

he and his wife were "officially over."  Tr. 740.  Clampit was upset about the divorce.  Tr. 741.
Mental status examination findings were similar to findings noted in May 2018 except his mood
was described as "frustrated."  Tr. 740-741.

During a July 24, 2018, psychiatric visit, Clampit reported that medication helped him
keep things in control.  Tr. 823.  Clampit's diagnoses were major depressive disorder, recurrent,
severe with psychotic symptoms and intermittent explosive disorder.  Tr. 826.  Clampit's
depression and anxiety were stable and his insomnia was better.  Tr. 827.  Clampit was instructed
to continue with his medications.  Tr. 827.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Clampit was represented by counsel and testified at the administrative hearing.  Tr. 52,
53-68.  When asked what problems prevented him from working full-time, Clampit indicated "It
hurts to walk.  I have a problem trusting people around me.  I always think someone's out to try
to get one over on me.  So, I just -- I don't really trust them."  Tr. 56.  When asked whether he
thought he would be able to keep a job if he found one, Clampit indicated "If people would leave
me alone, possibly, but in history, you have to deal with people all the time and I just -- I don't
get people . . . And I end up yelling and everything else at them and I can't help myself from
doing it."  Tr. 67-68.

Clampit explained that he saw a psychiatrist and counselor at Coleman.  Tr.  61.
Clampit's psychiatrist prescribed him medication.  Tr. 61.  His medical providers have diagnosed
him with bipolar disorder, depression, paranoia schizophrenia, and intermittent explosive anger
disorder.  Tr. 61.  Clampit's medications help "[a] little bit."  Tr. 64; *see also* Tr. 67 (stating that

medication helps "a little bit, but then there's also days that it doesn't do anything[]").   Clampit
discussed his psychiatric admission to the hospital.  Tr. 68.

Clampit explained he gets sad a lot; he does not want to do anything or talk to anyone; he
just wants to lie in bed.  Tr. 61-62.  There are also some days when he is "really uppity, happy-
go-lucky[.]"  Tr. 62.  Clampit relayed that he sometimes hears people telling him to do things but
individuals who are with him at the time tell him that they have not told him to do anything. Tr.
62-63.  Clampit indicated that his ability to pay attention or concentrate varies.  Tr. 68.

Clampit also explained that he gets angry very easily and he starts punching walls and
throwing things. Tr. 63.  When that happens, he tries to separate himself from others so he can
work on calming down.  Tr. 63.  Clampit relayed having had angry outbursts towards coworkers
that ended up involving his supervisor and him being let go from the job.  Tr. 63.  There have
also been times when Clampit walked out on jobs because he did not agree with what he was
being told he was supposed to do.  Tr. 63-64.

When asked about hobbies, Clampit relayed that he likes to shoot pool.  Tr. 59.  Clampit
stated that he has a pool table at home and he also plays pool at a bar where his cousin works,
explaining "I go there and he knows how to handle me.  So, I normally go there so that I know I
have somebody there I can trust."  Tr. 66.  When Clampit goes to the bar where his cousin
works, per Clampit, it is usually early when everyone is still at work so there are not a lot of
people there.  Tr. 66.  Clampit used to enjoy building motors and other things for cars but he lost
interest in doing that about a year prior to the hearing.  Tr. 59-60.  Clampit indicated he was not
involved at that time or in the past in any organized social activities, e.g., clubs or religious
activities. Tr. 60.  He explained he did not see the point in belonging to clubs or organizations
and there were "way too many people."  Tr. 67.

8

Clampit relayed that he stays in his house as much as possible.  Tr. 64-65.  Clampit can perform household chores but he procrastinates and does not always finish a chore once he starts it.  Tr. 65.  Clampit relayed that he sometimes has a lot of energy and other times he does not. Tr. 65.  He does not always feel like bathing or showering and does so maybe once or twice each week.  Tr. 65.  He gets antsy at times but could not say what caused him to feel that way.  Tr. 65. Clampit explained that he worries all the time.  Tr. 65.  He worries that other people are going to hurt him "or get one over on [him.]"  Tr. 66.  Clampit shops at grocery stores and places like Wal-Mart but he goes at night when there are not a lot of people there.  Tr. 67.

### 2.  Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 69-78.   The VE classified Clampit's past relevant work to include work as a construction worker, forklift operator, and palletizer or laborer.  Tr. 69-70.

The ALJ asked the VE to consider a hypothetical individual Clampit's age and with his education and work experience with the RFC for work at any exertional level but limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements such as moving assembly lines and conveyor belts; involving only work-related decisions with few, if any, work place changes; and occasional interaction with the general public, coworkers, and supervisors.  Tr. 70-71.  The VE indicated that the described individual would be unable to perform Clampit's past relevant work but there would be jobs in the national economy that the described individual could perform, including laundry worker, hand packager, and warehouse worker.[2]  Tr. 71.

---

[2] The VE provided national job incidence data for each of the identified jobs.  Tr. 71.

For his second hypothetical, the ALJ modified the first hypothetical from work at any exertional level to work at the light exertional level. Tr. 71-72. With that modification, the VE indicated that there would still be work available in the national economy, including laundry folder, inspector and hand packager, and housekeeper.[3] Tr. 72.

For his third hypothetical, the ALJ modified the first hypothetical to include an additional limitation, i.e., the described individual would need to be allowed to consistently be off task more than 10 percent of the workday. Tr. 72. The VE indicated that there would be no work available in the national economy for the described individual. Tr. 72. The VE explained that being off task more than 10 percent of the time is work preclusive. Tr. 72. Also, more than one absence per month for the entry level positions being discussed would be work preclusive. Tr. 72-73.

In response to questioning by Clampit's counsel, the VE indicated that if someone is occasionally (meaning up to one-third of an eight-hour workday) unable to maintain productivity expected of simple and repetitive, routine, unskilled work activity, that individual would not be able to sustain competitive activity. Tr. 73.

Clampit's counsel asked the VE whether the phrase "short cycle tasks" had any vocational meaning to him. Tr. 73. The VE replied, "Not specifically. I mean, I don't know specifically what that would mean as opposed to, you know, simple, routine, repetitive tasks." Tr. 73. In response to counsel's questioning, the VE indicated that "the ability to respond appropriately to supervision, co-workers, work situations, and deal with changes in a work setting" were "a basic demand of unskilled [competitive] work activity." Tr. 74. The VE indicated that he did not think that there would be more than occasional interaction with

---

[3] The VE provided national job incidence data for each of the identified jobs. Tr. 71.

supervisors during a training or probationary period for the identified jobs.  Tr. 75-76.  The VE explained that generally an employee has to be prepared for interaction with supervisors, even if occasional or brief and superficial, at times determined by the supervisors and an employee has to be able to accept criticism/feedback from a supervisor without outbursts, etc.  Tr. 76-78. Otherwise, it would be work preclusive.  Tr. 78.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

11

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[4]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his January 29, 2019, decision, the ALJ made the following findings:[5]

1.      Clampit meets the insured status requirements of the Social Security Act through December 31, 2021.  Tr. 30.

2.      Clampit has not engaged in substantial gainful activity since June 30, 2017, the alleged onset date.  Tr. 30-31.

3.      Clampit has the following severe impairments: depression/bi-polar disorder; anxiety/obsessive compulsive disorder; learning disability/borderline intellectual functioning; and paranoid personality/impulse control disorder.  Tr. 31.

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[5] The ALJ's findings are summarized.

4.    Clampit does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 31-34.

5.    Clampit has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: work limited to simple, routine, and repetitive tasks in an environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes; and occasional interaction with the general public, co-workers, and supervisors.  Tr. 34-41.

6.    Clampit is unable to perform any past relevant work.  Tr. 41.

7.    Clampit was born in 1987 and was 29 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 41.

8.    Clampit has at least a high school education and is able to communicate in English.  Tr. 42.

9.    Transferability of job skills is not material to the determination of disability.  Tr. 42.

10.   Considering Clampit's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Clampit can perform, including laundry worker, hand packager, and warehouse worker. Tr. 42-43.

Based on the foregoing, the ALJ determined that Clampit had not been under a disability, as defined in the Social Security Act, from June 30, 2017, through the date of the decision.  Tr. 43.

### V. Law & Analysis

**A.    Standard of review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

13

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.    The undersigned recommends that the Court AFFIRM the Commissioner's decision.**

Clampit presents one argument in this appeal.  He argues that the ALJ erred because he found the state agency psychological consultants' opinions persuasive and indicated that he accounted for them in the RFC but, without explanation, omitted critical limitations contained in those opinions.  Doc. 16, pp. 2, 6-11.  Therefore, Clampit asserts that the decision is not supported by substantial evidence and this Court should reverse the decision and remand the case for further proceedings.  Doc. 16, pp. 6-11.

The regulations applicable to Clampit's claim, which was filed after March 27, 2017,[6] set forth the various categories of evidence, which include (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) prior administrative medical findings.  20 C.F.R. § 404.1513(a)(1)-(5).  As the regulations explain, "A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review . . . in [claimant's] current claim based on their review of the evidence in [the claimant's] case record[.]"  20 C.F.R. § 404.1513(a)(5).

The regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  20 C.F.R. § 404.1520c(a). Different from the prior framework for evaluation of medical opinions that involved more weight generally being given to opinions from treating sources, i.e., the "treating physician rule," the new regulations provide that "administrative law judges will now evaluate the 'persuasiveness' of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still

---

[6] Since Clampit's claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'") (citing 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

Also, administrative law judges "will articulate how [they] considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." 20 C.F.R. § 404.1520c(b)(1). They "are not required to articulate how [they] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

The five factors are supportability, consistency, relationship with the claimant, specialization, and other factors, with supportability and consistency being the most important factors that are considered. 20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2). Therefore, administrative law judges "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). The regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). And, the "consistency" factor is explained as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

16

The regulations provide that administrative law judges "may, but are not required to, explain how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."[7]  20 C.F.R. § 404.152c(b)(2).  "Additionally, administrative law judges 'must consider' medical findings of non-examining state agency medical or psychological consultants according to the new regulation."  *Gower*, 2020 WL 1151069, at *4 (citing 20 C.F.R. § 404.1513a(b)(1)).  20 C.F.R. § 1513a(b)(1) ("Administrative law judges are not required to adopt any prior administrative medical findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate, because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation.").

Clampit asserts that, although both state agency psychological consultants limited him to occasional and superficial interaction with others, the ALJ only limited Clampit to occasional interaction with others; he did not limit him to superficial interaction with others or explain why that limitation was not adopted.  Doc. 16, pp. 8-10.  Clampit also contends that the ALJ failed to account for additional limitations contained in the opinion of state agency psychologist Dr. Haskins, who reviewed the record upon reconsideration, i.e., limitations of "short cycle tasks"; "work away from others"; and "have a set routine where major changes are explained in advance and gradually implemented to allow Mr. Clampit to adjust to new expectations[,]" and did not explain why those limitations were not accounted for.  Doc. 16, p. 10.

---

[7] However, where administrative law judges find that there are equally persuasive medical opinions or prior administrative medical findings about the same issue but where they are not exactly the same, administrative law judges "will articulate how [they] considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in [a claimant's] determination or decision."  20 C.F.R. § 404.1520c(b)(3).

As explained below, Clampit has not shown that, in order for the ALJ's RFC finding to be found supported by substantial evidence, the ALJ was required to adopt the psychologists' medical opinions verbatim or explain why specific limitations in those medical opinions were not adopted.

The ALJ, not a physician, is responsible for assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009).  When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding . . . [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*  And, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 267, 275 (6th Cir. 2015) (unpublished); *see also Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence).

Furthermore, an ALJ is not obligated to explain each limitation or restriction adopted or not adopted from a non-examining physician's opinion.  *See Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014) ("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight."); *see also* 20 C.F.R. § 404.1520c(b)(1) (indicating that ALJs "are not

required to articulate how [they] considered each medical opinion or prior administrative medical finding from one medical source individually.").

Here, the ALJ considered Clampit's subjective allegations regarding his mental health impairments as well as his mental health treatment history and opinion evidence.  Tr. 32-34, 35-40.  Following a detailed discussion of the evidence, consistent with the regulations, the ALJ considered the persuasiveness of the medical opinions and prior administrative medical findings.  Tr. 40-41.

With respect to the state agency psychological consultants' medical findings, the ALJ explained:

> The State psychiatric consultant, Juliette Savitscus, Ph.D., at the initial level, opined that the claimant is capable of simple and moderately complex tasks with 1-4 steps, workplace should not have high pace or production requirements, retains the ability for work in a setting with occasional superficial contact with others, and would be capable of responding appropriately to infrequent changes.  (Exhibits C2A/9-11 land C3A/9-l l)[.]  The limitations suggested by Dr. Savitscus are persuasive and accounted for by the adopted residual functional capacity because they are consistent with the nature, scope, or findings from the treatment record.  (Exhibits C3E, C2F/5, C4F, C9F/9-14, C10F/96, C15F/10-14, and hearing testimony)[.]
>
> The State psychiatric consultant, Kristen Haskins, Psy.D., at the reconsideration level, opined in the mental residual functional capacity assessment that the claimant is capable of simple and moderately complex tasks with 1-4 steps, he is capable of short cycle tasks in a setting that does not have fast pace demand where he can work away from others, he can work in a setting with occasional superficial contact with others, can work within a set routine where major changes are explained in advance and gradually implemented to allow time to adjust to new expectations, and his ability to handle stress and pressure in the work place would be reduced, but adequate to handle tasks without strict time limitations or production standards. (Exhibits C6A/10-12 and C7A/10-12)[.]  The limitations suggested by Dr. Haskins are persuasive and accounted for by the adopted residual functional capacity because they are consistent with the nature, scope, or findings from the treatment record. (Exhibits C3E, C2F/5, C4F, C9F/9-14, C10F/96, C15F/10- 14, and hearing testimony)[.]

Tr. 40.

The ALJ, as did the state agency psychological consultants, concluded that Clampit had moderate limitations in his ability to understand, remember or apply for information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  Tr. 32-34, 90, 121.  The ALJ accounted for Clampit's moderate mental impairment limitations in the RFC by limiting Clampit to "simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes [and] occasional interaction with the general public, co-workers, and supervisors."  Tr. 34.

Although the ALJ found the state agency medical consultants' limitations persuasive and stated that the limitations were "accounted for by the adopted [RFC][,]" Clampit has not shown that the ALJ was obligated to include the consultants' specific findings in the RFC.  As stated by the Sixth Circuit, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *See Reeves*, 618 Fed. Appx. at 275; *see also* 20 C.F.R. § 1513a(b)(1) (An ALJ must consider prior administrative medical findings but, an ALJ is "not required to adopt any prior administrative medical findings[.]").

Additionally, while the ALJ did not specifically state reasons for not including certain limitations that Clampit contends were critical, e.g. superficial interaction with others; short cycle tasks; working away from others; and having a set routine where major changes are explained in advance and gradually implemented, the ALJ was not required to do so.  *See Smith, supra* ("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion,

20

even when it is given significant weight."). The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record. *See* 20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 404.1546(c). Clampit has not shown that the ALJ failed to consider the relevant medical or other evidence. For example, the ALJ considered evidence indicating that Clampit did not get along well with others and stayed home as much as possible as well as evidence indicating that Clampit was able to play pool at his cousin's bar, visit with his in-laws a few times each week, and shop in retail stores. Tr. 32, 33, 35-36. Furthermore, as discussed, Clampit has not shown that the ALJ was required to adopt each specific limitation contained in the state agency psychological consultants' medical findings.

While Clampit contends that the ALJ should have included additional or more restrictive limitations in the RFC to account for limitations associated with Clampit's mental health impairments, he has not shown that the ALJ erred in his consideration or evaluation of the medical or other evidence of record. And, although the ALJ accepted as credible that Clampit had moderate limitations in mental functional abilities, the ALJ was not required to find that Clampit's limitations were as restrictive as Clampit alleged.

Based on the foregoing, the undersigned concludes that the ALJ did not err by finding the opinions of the state agency psychological consultants persuasive but not adopting each specific limitation contained therein and/or not detailing specific reasons for not including the exact limitations contained in those opinions. Furthermore, Clampit has not shown that the RFC is not supported by substantial evidence.

## VI. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

May 17, 2021                                   /s/ Kathleen B. Burke
                                               Kathleen B. Burke
                                               United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).